**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00007-CV**
_____

**IN RE COMMITMENT OF JASON WIRFS**

**On Appeal from the 356th District Court**
**Hardin County, Texas**
**Trial Cause No. 58936**

**MEMORANDUM OPINION**

The State of Texas filed a petition to commit Jason Wirfs (Wirfs or Appellant) as a sexually violent predator. *See* Tex. Health & Safety Code Ann. §§ 841.001-.151 (SVP statute). A jury found that Wirfs is a sexually violent predator. The trial court rendered a final judgment and an order of civil commitment, and Wirfs timely filed a notice of appeal. In two issues, Wirfs challenges the legal and factual sufficiency of the evidence supporting the jury's finding. We affirm.

## Evidence at Trial

Testimony of Jason Wirfs

Wirfs testified that he pleaded guilty to three counts of indecency with a child by contact, and at the time of trial he had been incarcerated for nine years.[1] Wirfs testified that he had no problem dealing with sex and had never been sexually attracted to children. According to Wirfs, although his sexual offenses were against three children,[2] he told the jury he was not attracted to children or to teenagers under the age of eighteen. Wirfs testified that he did not know why he committed the offenses but was hoping to get "therapy at the unit I'm at in the program."

Wirfs admitted that he "sexually offended" K.P., the daughter of his best friend's first wife. According to Wirfs, he was around K.P. in 2000 and 2001 when he was in a sexual relationship with K.P.'s mother. Wirfs testified that he "touched [K.P.] on her vagina with [his] hand." At trial he denied ever bathing K.P., but he agreed that in a 2009 written statement he provided to the police he admitted giving

---

[1] In one of the cases, Wirfs was indicted for continuous sexual assault of a child.

[2] According to the record, Wirfs was convicted of three counts of indecency with a child by contact for sexual contact with three children under the age of seventeen. We identify the victims by using initials. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

K.P. a bath when she was younger and he told the police in his handwritten statement that he touched K.P.'s vagina with his hand twice. He testified that he had no idea why he "sexually offended" K.P., and he stated that what he did to K.P. could cause her physical and emotional harm. Wirfs agreed he previously testified that he touched K.P. "on impulse" and "to see how she would react[.]" Wirfs also testified he had known K.P. since her birth and that he was "like an uncle[]" to K.P. Wirfs agreed that he bought K.P. presents and took her skating and to the mall. Wirfs testified that he also had an affair with his best friend's second wife and that he sexually assaulted her two daughters, R.C. and A.S. Wirfs agreed that he continued a sexual relationship with his best friend's second wife after she and his best friend "split[,]" and that R.C. and A.S. had stayed at Wirfs' home while his best friend's second wife was incarcerated. He testified that he met A.S., R.C., and their mother in 1998 or 1999, when A.S. was around three or four years old and R.C. was around two or three years old. He testified that he was a family friend and father figure to both A.S. and R.C. Although Wirfs testified that he only touched A.S. on her vagina once with his hand, he agreed that he had stated in a prior written statement to the police that he touched her vagina with his hand twice. According to Wirfs, the offense happened "[t]en years back" at his house and he "remember[ed] the incident happening, but not the details." Wirfs acknowledged that he had testified that when

3

he touched A.S. he "acted on irrational thought[]" and he "thought it would be funny[.]" Wirfs admitted he was originally charged with continuous sexual abuse of a child for what he did to R.C. but he "pled down to indecency with a child[.]" Wirfs agreed that in 2008 or 2009 he touched R.C.'s vagina when she was twelve or thirteen years old, and he said he had no idea why he did it and that he had no sexual motive. Wirfs agreed that in a prior handwritten statement he gave to the police he admitted sexually touching R.C. twice. Wirfs also admitted that in his written statement he stated he had also touched both R.C. and A.S. outside their clothes on their vaginas, but at trial he then denied committing those offenses. Wirfs also admitted at trial that he touched all three girls "sexually," but he agreed that in his deposition he had testified that the victims and others had conspired against him to bring the additional allegations.

Wirfs testified that while incarcerated he received ten disciplinaries. Wirfs received a major disciplinary for unauthorized contact with a victim, R.C., but Wirfs denied that he attempted to contact her. The victim reported that another inmate contacted her. According to Wirfs, his parole was revoked because of this disciplinary but Wirfs claimed there was no formal investigation. He also received a disciplinary the month before trial for an altercation with another offender and a disciplinary in 2016 for threatening to harm a female officer. Wirfs testified that he

4

wanted to participate in the sex offender treatment program but that he did not have a choice and was not allowed to participate until he was taken out of medium custody and placed back in the program. Wirfs testified that he had never had a problem with sex and was not preoccupied with sex, and he agreed that he had testified that he had over one hundred sexual partners.

Wirfs agreed that it was important for him to understand why he offended in order to prevent himself from reoffending in the future but testified that he hoped to complete the nine-month sex offender treatment program to find out why he offended. Wirfs testified that he believed that all the tools necessary to prevent him from reoffending sexually had not been offered to him, but he later admitted that they had been offered to him at one point. Wirfs testified that while incarcerated he took "Cognitive, . . . Voyager, several religious based classes" and worked in the kitchen, laundry, and garment factory. Wirfs testified he lived in a faith-based dorm but admitted that he was thrown out of the program because he was accused of being a member of the Aryan Brotherhood. According to Wirfs, he has never been a member of the Aryan Brotherhood and the chaplain who threw him out of the program was mistaken and offered to place Wirfs back in the program. Wirfs testified he was "100 percent[]" to blame for being in prison. According to Wirfs, he was born into a loving family and he feels he has not been a good father to his two

5

sons. Before being incarcerated, Wirfs worked as a crane operator, pipefitter, boilermaker, truck driver, and offshore worker.

Testimony of Dr. Self

David Self, M.D., a physician and board-certified psychiatrist, testified as an expert for the State. Self explained that he had been practicing forensic psychiatry since 1995, that he has been evaluating individuals for a behavioral abnormality since 2009, that he relied on the principles of forensic psychiatry when evaluating Wirfs, and that his testimony was within the scope of forensic psychiatry. Dr. Self testified that in this case he was asked to determine whether Wirfs has a behavioral abnormality as defined by Chapter 841 of the Texas Health and Safety Code. Dr. Self testified that a behavioral abnormality "is a condition that by virtue of affecting a person's cognitive or affective capacities render them - - predisposes them to commit acts of sexual violence to the extent they become a hazard to other people."

Dr. Self explained the methodology he uses in conducting a behavioral abnormality assessment, which includes a review of all available records and conducting a face-to-face psychiatric screening. He agreed that the methodology he uses is the methodology used by experts performing this type of evaluation. After reviewing records and interviewing Wirfs, Dr. Self formed an opinion that Wirfs has

6

a behavioral abnormality that predisposes him to engage in predatory acts of sexual violence.

Dr. Self met with Wirfs for about two and a half hours. Self also reviewed the education records, penitentiary packet, disciplinary records, medical records, depositions, Texas Emergency Action control records, a parole file, TDCJ files, and records from the Texas Juvenile Justice, the Dallas County District Clerk, the sex offender treatment program, the Hardin County Sheriff, Hardin County District Clerk, and Hardin County District Attorney.

Dr. Self did not administer any tests to Wirfs, but he reviewed the Static-99 actuarial testing of Wirfs administered by Dr. Charles Woodrick, the psychologist hired by the penitentiary to evaluate Wirfs in anticipation of his release from prison. According to Dr. Self, Wirfs scored a "zero" on that test, which "indicate[s] a very low risk for future offenses [and] that this individual had less risk than the average person with sex crimes being discharged from prison." Dr. Self explained that the creator of the Static-99 stated that it is not wise to consider the instrument alone in determining whether someone is likely to engage in predatory acts of violence. According to Dr. Self, the Static-99 does not account for all the important risk factors, such as the escalation of sexual violence, grooming behaviors, the age of the victims, sexual deviance, sexual desires, antisocial behavior beyond convictions,

7

intimacy deficits about interpersonal relationships, and lack of treatment. Self also agreed that it is misleading to attribute a percentage of risk to an individual just by looking at the Static-99 score.

Dr. Self explained that it is important to look at the offender's past sexual criminal history when answering whether the person is likely to sexually reoffend. According to Dr. Self, the facts and details of Wirfs' sexual offenses were significant in determining that Wirfs has a behavioral abnormality.

Dr. Self explained that the records show that Wirfs engaged in "grooming" with all three victims, which is a technique commonly seen with pedophiles as ways to lure a child in to make the child more at ease with being sexually abused and to gain the trust of adults so that they are less suspicious of them. Wirfs groomed his victims by buying them gifts, taking them places, making "quid pro quo" deals to take the victims where they wanted to go if they would let him touch them, and he also threatened to harm them or their family if they told people about what Wirfs was doing to them. According to Dr. Self, that Wirfs' grooming behavior was "confirmatory of a diagnosis of pedophilia."

According to the records Dr. Self reviewed, Wirfs' sexual offenses against K.P. started when she was only five or six years old when Wirfs would give her baths and "fondle her pubis during these baths and tell her that he did it because he

8

loved her." According to Self, the last episode that K.P. described was when Wirfs told her that he would let her take something home if she had sex with him. Self testified that Wirfs took K.P.'s clothes off, laid her on the bed, performed oral sex on her, tried to insert his penis, and when she started crying, he got angry and took her home. Self also testified that K.P. reported that, on one occasion, Wirfs directed K.P. to go in the bathroom, wipe herself with her panties, and leave her panties on the back of the toilet. According to Self, "that's very explicit and kind of extraneous detail, which is one of the hallmarks of a true statement, when people include superfluous detail." Self testified that Wirfs' offenses against K.P. came to light when K.P. was fifteen years old and had a baby. K.P.'s grandmother overheard K.P. tell Wirfs over the phone "something to the effect . . . no, you can't see my baby. You'll not do to my baby what you did to me." The grandmother then asked K.P. what Wirfs had done to her and K.P. told her grandmother what Wirfs had done to K.P. After that, the other two victims were questioned, and they also told the police about what Wirfs had done to them.

A.S. and R.C. were daughters of Wirfs' paramour and Wirfs and their mother had an affair while she was married to his best friend. Self testified that after their mother divorced Wirfs' best friend, she went to the penitentiary for aggravated sexual assault of a fourteen-year-old boy. According to Self, while the mother was

9

incarcerated, A.S. and R.C. were in the care of the mother's sister, who then asked Wirfs if the girls could live with him. Self testified that the records revealed A.S. and R.C. moved into a trailer with Wirfs until their mother got out of the penitentiary and then they all moved to Orangefield. During that time, the girls received lots of gifts from Wirfs and privileges that became rewards for compliance with Wirfs sexual demands.

Dr. Self explained that, according to the records, A.S. was ten years old in 2004 when Wirfs, who was a long-haul truck driver, took her with him to California in his truck. A.S. told the police that Wirfs began fondling A.S.'s pubis outside her clothes for several days on the trip and started putting his hand down inside her pants and touching her skin and penetrating her vagina with his finger. The abuse continued and escalated to intercourse several times when they returned home, and the abuse "went on for quite some time." Self testified that A.S. also received similar threats from Wirfs as K.P. received. Self testified that the records suggest that once, Wirfs gave A.S. vodka and then a pill, told her that if she took the pill, she would not get drunk, and then she blacked out until the next day. According to Dr. Self, the escalation of Wirfs' offenses is "a classic pattern of a pedophile[]" as they get away with offenses "they'll step up a notch to make it more sexually exciting to them."

10

Dr. Self testified that, according to his review of records, R.C. was the youngest of Wirfs' three victims. When R.C. moved into the trailer with Wirfs, Wirfs started touching her on the outside of her clothes, it escalated to touching her inside her clothes, and then Wirfs had intercourse with her. Dr. Self testified that the records revealed that R.C. reported that Wirfs used a condom during two of the incidents of intercourse and on one other he did not, and Self felt that this type of detail by R.C. lent "a lot of credibility to the whole thing."

Dr. Self explained that sexual deviance is the "biggest driver of risk" and that "the facts of this matter support a diagnosis of a sexually deviant interest." According to Dr. Self, Wirfs is sexually deviant, and both Dr. Self and Dr. Woodrick diagnosed Wirfs with "pedophilic disorder," a sexual attraction to children that the person fantasizes about or has strong urges and that attraction makes the person act on it. To have a pedophilic disorder, the perpetrator must be over sixteen years old, there is at least five years age difference between the actor and the victim, and the offenses occur over at least a six-month time frame. Dr. Self explained that his diagnosis that Wirfs' has a pedophilic disorder is strengthened by the fact that Wirfs had age-appropriate sexual partners at the same time he was sexually offending his victims, and he chose to offend against young girls because of his "strong urge and drive in that direction." Dr. Self testified that Wirfs admitted during the interview

11

that he is sexually attracted to children and that his sexual interest was "70/80 percent adults . . . and 20/30 children." When asked about Wirfs' testimony that he is not attracted to children but to teenagers, Self responded as follows:

> Well, he has demonstrated an affinity for children. . . . You know, ten years old, going to California and fondling them. So if he still endorses that, I'm worried about it. He's in the midst of his sexual potency. He's at high risk.

Self testified that the records show that Wirfs had three female victims and that it was significant that he gained access to each child through relationships with their single mothers, a frequent behavior of pedophiles. Dr. Self found it was significant that Wirfs' victims were young and the "rule of thumb" is "the younger the child that gets abused, the more worrisome the higher the risk is." Dr. Self also found it was significant that the offenses against K.P. spanned a ten-year time frame. When Wirfs described the offenses against the children, Wirfs described his offenses as if "he touched them and that's it," which is typical of sex offenders as they minimize and are in denial about their sexual offenses and that is proven to be a risk factor for reoffending. Dr. Self testified that Wirfs has not gained enough insight to prevent himself from reoffending in the future and Wirfs has an "attitude tolerant of sexual assault" as demonstrated by the answers Wirfs gave stating he did not know why he did it, he only acknowledged having touched them, and he said he was "just having fun." Self explained that the records revealed that Wirfs blamed his victims,

12

called one of them a whore, and once when Wirfs was asked if he could change anything about what had happened he answered that he would talk to the victims' parents about how the children dressed and behaved. Wirfs has not taken full ownership and responsibility for his sexual offense as he has testified that he only touched them one time, and that this shows his inability and unwillingness to address and change the problem. And Wirfs' statements from the past year have provided "several examples of wild inconsistency." Self testified that although Wirfs appears to have a good support system available to him, if Wirfs' support system is unaware of all the facts and of what Wirfs is capable of, it would not be an appropriate support system. Dr. Self is also concerned that Wirfs received a disciplinary for his continued interest in R.C. that "stayed with him over the years in prison[,]" and that Wirfs shared his "packet" with information about his offenses with thirty other offenders while incarcerated. Self testified that Wirfs' non-sexual criminal history, "two legal entries" involving stealing televisions and a chainsaw, played a minor role in his evaluation because theft is an antisocial behavior and antisocial or unstable lifestyle is a risk factor for reoffending. Dr. Self concluded that Wirfs has several antisocial traits: lying, manipulating, stealing, and assaultive behavior. Wirfs also told Dr. Self that during the two years before incarceration he took large amounts of the narcotic Hydrocodone. Dr. Self diagnosed Wirfs with a history of cocaine abuse as Wirfs

reported to him that "for two years he snorted 100--dollars['] worth of cocaine every day." Self testified that chemical dependency of any sort would be another risk factor and that "[c]hemical dependency of stimulant drugs like Cocaine or speed . . . puts people at high risk . . . of [a]ssaultive behaviors of all sorts, sexual and non-sexual." Dr. Self also noted that Wirfs has not had sex offender treatment because of his status being changed after Wirfs tried to contact a victim, and that, to Self's knowledge, Wirfs has not been consistent in stating that he wants to engage in treatment. Dr. Self explained that it is important for Wirfs to understand why he offended his victims in order to get him the tools to prevent himself from reoffending sexually, and Wirfs does not have these tools. Self testified that Wirfs' age, forty-four, is not "high risk" per the Static but that "he's still in the midst of his sexual potency . . . [c]ertainly in an age group where he can go and find another single mother with daughters." According to Dr. Self, Wirfs' risk factors indicate that Wirfs is "at a moderately high risk" of reoffending sexually.

On cross-examination, Self agreed that, compared to the other cases he has reviewed, Wirfs offenses are not the worst. Self also acknowledged that the records show that Wirfs' alleged contact with R.C. while he was incarcerated was made a year before it was reported and that it was reported around the time Wirfs' parole was published. When asked whether Self perceives himself to have a bias in regards

14

to sex offending against children, Dr. Self responded, "I have a particular place in my heart for children[,] I feel protective of them, and I factor that [in] when I make decisions in these matters." Self acknowledged that according to what Boccaccini and Murrie published, the overall average rate for Texas sex offenders to sexually reoffend is 3.3 percent, but for all crimes it is 11 percent. Self agreed that the lowest score you can get on the Static-99 is a negative 3, that Wirfs' score of "zero" is specifically labeled below average risk, and that "2.8 [percent] with the conference interval at 2.2 to 3.5[]" of people with the score of "zero" have been shown to reoffend. According to Self, he reviewed Dr. Woodrick's scoring of Wirfs on the PCL-R actuarial test, Wirfs' score of "twelve" suggested he is not a psychopath, and that he would probably raise his assessment of risk if Wirfs was a prototypic psychopath. Self agreed that, as to Wirfs' theft charges, the chainsaw was stolen from his father and the charges ultimately dismissed, and Wirfs successfully completed probation (after an 18-month extension for a technical violation) for the other theft charge. Dr. Self agreed that the SVP statute is for the small but extremely dangerous group of sex offenders, and that, despite Wirfs below-average score on the Static-99, the HARE PCL-R, not being a sexual recidivist, not being a psychopath, in Dr. Self's opinion Wirfs belongs in the category of sex offenders defined in the SVP statute.

15

Wirfs did not call any witnesses.

## The SVP Statute

In an SVP civil commitment proceeding, the State bears the burden to prove beyond a reasonable doubt that the respondent is a sexually violent predator. *See* Tex. Health & Safety Code Ann. § 841.062; *In re Commitment of Morales*, 98 S.W.3d 288, 291 (Tex. App.—Beaumont 2003, pet. denied). A person is a sexually violent predator if the person "is a repeat sexually violent offender[] and suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code Ann. § 841.003(a).[3] A behavioral abnormality is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

## Legal and Factual Sufficiency

In his first issue, in arguing the evidence is legally insufficient to support the jury's finding, Wirfs contends the "evidence in this case conclusively establishes that Mr. Wirfs does not suffer from a behavioral abnormality and therefore, is not a

---

[3] On appeal, Wirfs does not argue that he is not a repeat sexually violent offender.

16

[] part of the 'small but extremely dangerous group of sexually violent predators[.]'" According to Wirfs, Dr. Self's "bias against sex crimes involving children played a significant role in his decision to conclude that Mr. Wirfs has a behavioral abnormality."

Under a legal sufficiency review, we assess all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment under the SVP statute. *In re Commitment of Mullens*, 92 S.W.3d 881, 885 (Tex. App.—Beaumont 2002, pet. denied). It is the factfinder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* at 887. Under a factual sufficiency review, we weigh the evidence to determine "whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial." *In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied).

In this case, Dr. Self testified that Wirfs suffers from a behavioral abnormality that predisposes him to engage in a predatory act of sexual violence. The jury heard Dr. Self testify that, although Wirfs' score of "zero" on the Static-99 suggested a low risk of recidivism, the Static-99 does not account for all the important risk

factors, such as the escalation of sexual violence, grooming behaviors, the age of the victims, sexual deviance, sexual desires, antisocial behavior beyond convictions, intimacy deficits regarding interpersonal relationships, and lack of treatment. Dr. Self diagnosed Wirfs with pedophilic disorder and described him as sexually deviant. The jury heard Self testify that sexual deviance is the "biggest driver of risk[.]" The jury heard Self's testimony that there was evidence of Wirfs "grooming" all three victims, which is a technique commonly seen with pedophiles. Self testified that the escalation of Wirfs' offenses is "a classic pattern of a pedophile[]" as they get away with offenses "they'll step up a notch to make it more sexually exciting to them." Dr. Self testified Wirfs' pedophilic orientation is strengthened by the fact that he had age-appropriate sexual partners at the time of his offenses, and he chose to commit his sexual offenses against young girls because of his "strong urge and drive in that direction." Dr. Self also characterized Wirfs as having an attitude tolerant of sexual assault, as not taking responsibility for his sexual offenses, and as minimalizing and rationalizing his offenses and blaming his victims. Self explained that the fact that Wirfs had no sex offender treatment also increases Wirfs' risk for reoffending. According to Dr. Self, Wirfs also has several antisocial traits: lying, manipulating, stealing, and assaultive behavior. And the jury heard testimony from Dr. Self that there was evidence of Wirfs' chemical dependency, and that chemical

18

dependency of any sort would also be a risk factor and puts people at a high risk of assaultive behavior, that Wirfs lacked the tools necessary to prevent himself from reoffending sexually, and that Wirfs' risk factors suggest that Wirfs is "at a moderately high risk" of reoffending sexually.

The jury was entitled to infer Wirfs' current dangerousness from the evidence presented, including the experts' testimony, Wirfs' past behavior, and Wirfs' own testimony. *See In re Commitment of Wilson*, No. 09-08-00043-CV, 2009 Tex. App. LEXIS 6714, at *14 (Tex. App.—Beaumont Aug. 27, 2009, no pet.) (mem. op.). As the sole judge of the weight and credibility of the evidence, the jury could reasonably conclude that Wirfs suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See In re Commitment of Lowe*, No. 09-14-00098-CV, 2014 Tex. App. LEXIS 10034, at *6 (Tex. App.—Beaumont Sept. 4, 2014, no pet.) (mem. op.); *see also Wilson*, 2009 Tex. App. LEXIS 6714, at *14; *Mullens*, 92 S.W.3d at 887. We conclude that the jury's verdict is supported by legally sufficient evidence. *See Mullens*, 92 S.W.3d at 885. We overrule issue one.

In his second issue, in arguing the evidence is factually insufficient to support the jury's finding, Wirfs relies primarily on *In re Commitment of Stoddard*, No. 02-

19

17-00364-CV, 2019 Tex. App. LEXIS 4464 (Tex. App.—Fort Worth May 30, 2019, pet. filed) (mem. op.).[4]

In a split decision, the Fort Worth Court of Appeals majority reversed the jury's verdict finding Stoddard to be a sexually violent predator. *Id.* at \*27. The majority reasoned that "Chapter 841 applies only to a member of a small group of extremely dangerous sex offenders" and, without limitation to "'narrow circumstances[,]'" could not pass constitutional muster. *Id.* at \*33 (citing *Kansas v. Hendricks*, 521 U.S. 346, 357 (1997)). Although the Court described Stoddard's crimes as "indisputably reprehensible," it found that they "pale[d] in comparison to those of sexually violent predators whose commitments ha[d] been upheld." *Id.* at \*35. The Stoddard majority found, "[i]n most cases . . . surveyed, the civilly committed sexual violent predator had a history of multiple sexual offenses over an extended period of time." *Id.* It then determined that Stoddard's three convictions, history of nonsexual prior offenses, standardized evaluation scoring, substance

---

[4] On appeal, Wirfs cites *In re Commitment of Stoddard*, No. 02-17-00364-CV, 2018 Tex. App. LEXIS 7916 (Tex. App.—Fort Worth Sept. 27, 2018) (mem. op.). After Wirfs filed his appellate brief in this case, the Fort Worth Court of Appeals withdrew its prior opinion and judgment and issued a new memorandum opinion and judgment on rehearing. *See In re Commitment of Stoddard*, No. 02-17-00364-CV, 2019 Tex. App. LEXIS 4464, at \*1 (Tex. App.—Fort Worth May 30, 2019, pet. filed) (mem. op.).

abuse diagnosis, and evidence of risk factors was factually insufficient to support a finding that Stoddard was a sexually violent predator. *Id.* at \*\*29-47.

Wirfs argues that, like Stoddard, he is not in that "small class" of the "extremely dangerous" sex offenders for whom civil commitment is intended. Wirfs asserts he only had three convictions of indecency with a child by contact and "two illegal entries for stealing a television and a chainsaw[,]" his scores on actuarial testing did not indicate a high risk for reoffending, and the State presented no evidence that Wirfs was under the influence of cocaine at the time of the sexual offenses or that he continues to suffer from a substance abuse problem. Wirfs ignores all the other evidence and the expert testimony.

The shorter duration or length of an offender's sentences and alleged "lack of heinousness" of the underlying offenses does not preclude a jury from finding that the individual offender meets the statutory definition of a sexually violent predator. *See In re Commitment of Mendoza*, No. 05-18-01202-CV, 2019 Tex. App. LEXIS 9141, at \*23 (Tex. App.—Dallas Oct. 16, 2019, pet. denied) (mem. op.) (quoting *In re Commitment of Joiner*, No. 05-18-01001-CV, 2019 Tex. App. LEXIS 8032, at \*28 (Tex. App.—Dallas Aug. 30, 2019, no pet.) (mem. op.)) (finding such inquiries are "not relevant"). Furthermore, "a person's psychopathy is not a requisite finding that must be made in support of his commitment as a sexually violent predator." *In*

21

*re Commitment of Hebert*, 578 S.W.3d 154, 159 (Tex. App.—Tyler 2019, no pet.). We have previously set forth the statutory criteria and definitions under Chapter 841 necessary to support a civil commitment of an SVP, and the criteria and definitions submitted to this jury correctly, "describe[] the severity of the behavioral abnormality[,] . . . the severity of the danger which must be present[,] . . . [and the] behavior caused by an abnormality that makes the person a menace to the health and safety of another person." *In re Commitment of Almaguer*, 117 S.W.3d 500, 505 (Tex. App.—Beaumont 2003, pet. denied). Our focus under the sufficiency analysis is whether the evidence was sufficient to support the jury's determination that the State established the requisite elements to support its finding that Wirfs is an SVP. We reject Wirfs argument that this court should compare the underlying facts and circumstances of Wirfs' case to facts of other SVP cases in the factual sufficiency review because the other cases were not submitted to this jury. *See In re Commitment of Metcalf*, ___ S.W.3d _____, No. 06-19-00043-CV, 2020 Tex. App. LEXIS 2227, at *27 (Tex. App.—Texarkana March 18, 2020, no pet. h.). Our task in a factual sufficiency review is to consider *all* the evidence presented in *this* case and then weigh the evidence to determine whether a verdict that is supported by legally sufficient evidence "nevertheless reflects a risk of injustice that would compel ordering a new trial." *See Day*, 342 S.W.3d at 213. Comparing isolated facts from

22

other SVP cases, or the heinousness of the offenses of this case to other cases, or even the test results of this offender to results of other offenders on standardized tests, lends little to this review because it deviates from our task in a factual sufficiency review.[5] Applying the proper standard of review, we have weighed all of the evidence in the record and conclude that the jury could have found beyond a reasonable doubt that Wirfs was a repeat sexually violent offender who suffers from a "behavioral abnormality that makes him likely to engage in a predatory act of sexual violence" as defined by the statute, and we see no injustice in the jury's verdict that would require a new trial. *See id*. The evidence is factually sufficient. We overrule issue two.

---

[5] We note that our Court has previously upheld a jury's determination in civil commitments where the defendant had also scored a zero on the Static-99. *See*, *e.g., In re Commitment of Ramshur*, No. 09-17-00286-CV, 2018 Tex. App. LEXIS 10021, at **5, 18 (Tex. App.—Beaumont Dec. 6, 2018, no pet.) (mem. op.); *In re Commitment of Roberts*, No. 09-14-00475-CV, 2016 Tex. App. LEXIS 1659, at *9 (Tex. App.—Beaumont Feb. 18, 2016, no pet.) (mem. op.). We reject Wirfs' argument that the State has the burden to prove something other than the elements defined in the statute and we disagree with Wirfs arguments to the contrary. *See In re Commitment of Mendoza*, No. 05-18-01202-CV, 2019 Tex. App. LEXIS 9141, at *23 (Tex. App.—Dallas Oct. 16, 2019, pet. denied) (mem. op.) (citing *In re Commitment of Joiner*, No. 05-18-01001-CV, 2019 Tex. App. LEXIS 8032, at *28 (Tex. App.—Dallas Aug. 30, 2019, no pet. (mem. op.)); *see also In re Commitment of Renshaw*, No. 06-19-00069-CV, 2020 Tex. App LEXIS 966, at **16-23 (Tex. App.—Texarkana Feb. 5, 2020, no pet. h.).

We affirm the trial court's judgment and order of civil commitment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on January 2, 2020
Opinion Delivered April 16, 2020

Before McKeithen, C.J., Horton and Johnson, JJ.